## State of N.Y. ex rel. Edelweiss Fund, LLC v JPMorgan Chase & Co.

2025 NY Slip Op 31087(U)

April 4, 2025

Supreme Court, New York County

Docket Number: Index No. 100559/2014

Judge: Andrew Borrok

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 53

---------------------------------------------------------------------------------X

STATE OF NEW YORK EX REL. EDELWEISS FUND, LLC,

Plaintiff,

- v -

JPMORGAN CHASE & CO., CITIGROUP, INC.,M&T BANK CORPORATION, WELLS FARGO & COMPANY, MERRILL LYNCH & CO., INC.,MORGAN STANLEY SMITH BARNEY LLC,JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC,J.P. MORGAN SECURITIES, INC.,CITIBANK, N.A, CITIGROUP GLOBAL MARKETS, INC.,CITIGROUP FINANCIAL PRODUCTS, INC.,CITIGROUP GLOBAL MARKETS HOLDINGS, INC.,M&T BANK, BANK OF AMERICA CORPORATION, BANK OF AMERICA N.A., BANC OF AMERICA SECURITIES LLC,MERRILL LYNCH, PIERCE, FENNER & SMITH INC.,BOFA MERRILL LYNCH ASSET HOLDINGS, INC.,MORGAN STANLEY, MORGAN STANLEY & CO. LLC,MORGAN STANLEY BANK, N.A., MORGAN STANLEY CAPITAL SERVICES INC.,MORGAN STANLEY CAPITAL GROUP INC.,

Defendant.

---------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 100559/2014 |
| **MOTION DATE** | 07/02/2024, 07/02/2024, 07/02/2024, 07/02/2024, 07/02/2024, 07/02/2024, 07/02/2024, 07/02/2024, 07/02/2024, 07/02/2024 |
| **MOTION SEQ. NO.** | 106 107 108 109 110 111 112 115 116 117 |

**DECISION + ORDER ON MOTION**

HON. ANDREW BORROK:

The following e-filed documents, listed by NYSCEF document number (Motion 106) 1566, 1567, 1568, 1569, 1570, 1571, 1572, 1573, 1574, 1575, 1576, 1577, 1578, 1579, 1580, 1581, 1582, 1583, 1584, 1585, 1586, 1587, 1588, 1589, 1590, 1591, 1592, 1593, 1594, 1595, 1596, 1597, 1598, 1599, 1600, 1601, 1602, 1603, 1604, 1605, 1606, 1607, 1608, 1609, 1610, 1611, 1612, 1613, 1614, 1615, 1616, 1617, 1618, 1619, 1620, 1621, 1622, 1623, 1624, 1625, 1626, 1627, 1628, 1629, 1630, 1631, 1632, 1633, 1634, 1635, 1636, 1637, 1638, 1639, 1701, 1704, 1705, 1706, 1707, 1708, 1709, 1710, 1711, 1712, 1713, 1714, 1715, 1716, 1717, 1718, 1719, 1720, 1721, 1722, 1723, 1724, 1725, 2601, 2602, 2603, 2604, 2605, 2606, 2607, 2608, 2609, 2610, 2690, 2691, 2692, 2693, 2694, 2695, 2853, 2854
were read on this motion to/for                    SUMMARY JUDGMENT(AFTER JOINDER                    .

The following e-filed documents, listed by NYSCEF document number (Motion 107) 1728, 1729, 1730, 1731, 1732, 1733, 1734, 1735, 1736, 1737, 1738, 1739, 1740, 1741, 1742, 1743, 1744, 1745, 1746, 1747, 1748, 1749, 1750, 1751, 1752, 1753, 1754, 1755, 1756, 1757, 1758, 1759, 1760, 1761, 1762, 1763, 1764, 1765, 1766, 1767, 1768, 1769, 1770, 1771, 1772, 1773, 1774, 1775, 1776, 1777, 1778, 1779, 1780, 1781, 1782, 1783, 1919, 2578, 2579, 2580, 2581, 2582, 2706, 2707, 2708, 2709, 2710, 2711, 2712, 2713, 2714, 2715, 2716, 2717, 2721, 2823, 2824
were read on this motion to/for                    SUMMARY JUDGMENT(AFTER JOINDER                    .

100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE                    Page 1 of 44
Motion No.  106 107 108 109 110 111 112 115 116 117

1 of 44

[* 1]

The following e-filed documents, listed by NYSCEF document number (Motion 108) 1833, 1834, 1835, 1836, 1837, 1838, 1839, 1840, 1841, 1842, 1843, 1844, 1845, 1846, 1847, 1848, 1849, 1850, 1851, 1852, 1853, 1854, 1855, 1856, 1857, 1858, 1859, 1860, 1861, 1862, 1863, 1864, 1865, 1866, 1867, 1868, 1869, 1870, 1871, 1872, 1873, 1874, 1875, 1876, 2258, 2275, 2276, 2281, 2533, 2534, 2535, 2536, 2537, 2538, 2539, 2696, 2697, 2698, 2699, 2700, 2701, 2702, 2728, 2754, 2825, 2826

were read on this motion to/for         SUMMARY JUDGMENT(AFTER JOINDER    .

The following e-filed documents, listed by NYSCEF document number (Motion 109) 1881, 1882, 1883, 1884, 1885, 1886, 1887, 1888, 1889, 1890, 1891, 1892, 1893, 1894, 1895, 1896, 1897, 1898, 1899, 1900, 1901, 1902, 1903, 1904, 1905, 1906, 1907, 1908, 1909, 1910, 1911, 1912, 1913, 1914, 1915, 1916, 1917, 1918, 1920, 1921, 1922, 1923, 1924, 1925, 1926, 1927, 1928, 1929, 1930, 1931, 1932, 1933, 1934, 1935, 1936, 1937, 1938, 1939, 1940, 1941, 1942, 1943, 1944, 1945, 1946, 1947, 1948, 2253, 2254, 2628, 2629, 2630, 2631, 2632, 2668, 2669, 2670, 2671, 2672, 2673, 2674, 2675, 2741, 2742, 2791, 2844, 2845

were read on this motion to/for         SUMMARY JUDGMENT(AFTER JOINDER    .

The following e-filed documents, listed by NYSCEF document number (Motion 110) 1949, 1950, 1951, 1952, 1953, 1954, 1955, 1956, 1957, 1958, 1959, 1960, 1961, 1962, 1963, 1964, 1965, 1966, 1967, 1968, 1969, 1970, 1971, 1972, 1973, 1974, 1975, 1976, 1977, 1978, 1979, 1980, 1981, 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2160, 2161, 2162, 2612, 2613, 2614, 2615, 2616, 2617, 2618, 2619, 2620, 2621, 2622, 2623, 2624, 2625, 2755, 2756, 2757, 2758, 2759, 2760, 2761, 2762, 2763, 2764, 2765, 2838, 2839, 2855

were read on this motion to/for         JUDGMENT - SUMMARY    .

The following e-filed documents, listed by NYSCEF document number (Motion 111) 1640, 1641, 1642, 1643, 1644, 1645, 1646, 1647, 1648, 1649, 1650, 1651, 1652, 1653, 1654, 1655, 1656, 1657, 1658, 1659, 1660, 1661, 1662, 1663, 1664, 1665, 1666, 1667, 1668, 1669, 1670, 1671, 1672, 1673, 1674, 1675, 1676, 1677, 1678, 1679, 1680, 1681, 1682, 1683, 1684, 1685, 1686, 1687, 1688, 1689, 1690, 1691, 1692, 1693, 1694, 1695, 1696, 1697, 1698, 1699, 1700, 2683, 2729, 2730, 2731, 2732, 2733, 2734, 2735, 2736, 2737, 2738, 2739, 2740, 2834, 2835, 2836, 2837

were read on this motion to/for         JUDGMENT - SUMMARY    .

The following e-filed documents, listed by NYSCEF document number (Motion 112) 1784, 1785, 1786, 1787, 1788, 1789, 1790, 1791, 1792, 1793, 1794, 1795, 1796, 1797, 1798, 1799, 1800, 1801, 1802, 1803, 1804, 1805, 1806, 1807, 1808, 1809, 1810, 1811, 1812, 1813, 1814, 1815, 1816, 1817, 1818, 1819, 1820, 1821, 1822, 1823, 1824, 1825, 1826, 1827, 1828, 1829, 1830, 1831, 1832, 2457, 2583, 2584, 2585, 2586, 2587, 2588, 2589, 2590, 2591, 2592, 2593, 2594, 2595, 2596, 2597, 2598, 2599, 2600, 2611, 2667, 2684, 2685, 2686, 2743, 2744, 2745, 2746, 2747, 2748, 2749, 2750, 2751, 2752, 2753, 2840, 2841, 2842, 2843, 2846, 2860

were read on this motion to/for         JUDGMENT - SUMMARY    .

The following e-filed documents, listed by NYSCEF document number (Motion 115) 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024, 2025, 2026, 2027, 2028, 2029, 2030, 2031, 2032, 2033, 2034, 2035, 2036, 2037, 2038, 2039, 2040, 2041, 2042, 2043, 2044, 2045, 2046, 2047, 2048, 2049, 2050, 2051, 2052, 2053, 2054, 2055, 2056, 2057, 2058, 2059, 2060, 2470, 2471, 2472, 2473, 2474, 2475, 2476, 2477, 2478, 2479, 2480, 2481, 2482, 2483, 2484, 2485, 2486, 2487, 2488, 2489, 2490, 2491, 2492, 2493, 2494, 2495, 2496, 2497, 2498, 2499, 2500, 2501, 2502, 2503, 2504, 2505, 2506, 2507, 2508, 2509, 2510, 2511, 2512, 2513, 2514, 2515, 2516, 2517, 2532, 2722, 2723, 2724, 2827, 2828, 2829

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                     **Page 2 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

[* 2]

were read on this motion to/for         JUDGMENT - SUMMARY     .

The following e-filed documents, listed by NYSCEF document number (Motion 116) 2061, 2062, 2063, 2064, 2065, 2066, 2067, 2068, 2069, 2070, 2071, 2072, 2073, 2074, 2075, 2076, 2077, 2078, 2079, 2080, 2081, 2082, 2083, 2084, 2085, 2086, 2087, 2088, 2089, 2090, 2091, 2092, 2093, 2094, 2095, 2096, 2097, 2098, 2099, 2100, 2101, 2102, 2103, 2104, 2105, 2106, 2107, 2108, 2109, 2110, 2111, 2112, 2113, 2114, 2115, 2116, 2117, 2118, 2119, 2120, 2121, 2122, 2123, 2124, 2125, 2126, 2127, 2128, 2129, 2130, 2131, 2132, 2133, 2134, 2135, 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2144, 2145, 2146, 2147, 2148, 2149, 2150, 2151, 2152, 2153, 2154, 2155, 2156, 2157, 2540, 2541, 2542, 2543, 2544, 2545, 2546, 2547, 2548, 2549, 2550, 2551, 2552, 2553, 2554, 2555, 2556, 2557, 2558, 2559, 2560, 2561, 2562, 2563, 2564, 2565, 2566, 2567, 2568, 2569, 2570, 2571, 2572, 2573, 2574, 2575, 2576, 2577, 2658, 2666, 2677, 2678, 2679, 2680, 2681, 2682, 2725, 2726, 2727, 2830, 2831, 2832

were read on this motion to/for         JUDGMENT - SUMMARY     .

The following e-filed documents, listed by NYSCEF document number (Motion 117) 2165, 2166, 2167, 2168, 2169, 2170, 2171, 2172, 2173, 2174, 2175, 2176, 2177, 2178, 2179, 2180, 2181, 2182, 2183, 2184, 2185, 2186, 2187, 2188, 2189, 2190, 2191, 2192, 2193, 2194, 2195, 2196, 2197, 2198, 2199, 2200, 2201, 2202, 2203, 2204, 2205, 2206, 2207, 2208, 2209, 2210, 2211, 2212, 2213, 2214, 2215, 2216, 2217, 2218, 2219, 2220, 2221, 2222, 2223, 2224, 2225, 2226, 2227, 2228, 2229, 2230, 2231, 2232, 2233, 2234, 2235, 2236, 2237, 2238, 2239, 2240, 2241, 2242, 2243, 2244, 2245, 2246, 2247, 2248, 2249, 2250, 2458, 2459, 2460, 2461, 2462, 2463, 2464, 2465, 2466, 2467, 2468, 2469, 2518, 2637, 2638, 2639, 2640, 2641, 2642, 2643, 2644, 2645, 2646, 2647, 2648, 2649, 2650, 2651, 2652, 2653, 2654, 2655, 2656, 2659, 2660, 2661, 2766, 2767, 2768, 2769, 2770, 2771, 2772, 2773, 2774, 2775, 2776, 2777, 2778, 2779, 2780, 2781, 2782, 2783, 2784, 2785, 2786, 2787, 2849, 2850, 2851, 2852, 2857

were read on this motion to/for         JUDGMENT - SUMMARY     .

The New York False Claims Act (the **NYFCA**; State Finance Law §§ 187-194) claims involving private conduit bonds are dismissed because Edelweiss Fund, LLC (**Relator**) fails to establish that the State of New York (**NY**) incurred damages—an essential element of a NYFCA claim (State Finance Law § 192 [2]).[1] Simply put, according to Relator, the damages stemming from the alleged violations of the NYFCA were the payment of certain remarketing fees, liquidity fees and the payment of interest at a rate which was not the minimum rate necessary for the bonds to

---

[1] In *Wisconsin Bell, Inc. v United States ex rel. Heath*, 145 S Ct 498, 505-508 (2025), the United States Supreme Court held that the reimbursement requests at issue in that case qualified as "claims" under the federal False Claims Act (31 USCA § 3729) but made the prescient observation that there may well be issues about damages where the money comes from private payers.

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**          **Page 3 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

[* 3]

clear at par in the required judgment of the Defendants. On the fully developed record,[2] with respect to the private conduit bonds at issue, none of these payments were made by NY such that NY suffered damages.[3] As such, these claims must be dismissed without prejudice.[4]

The Defendants (hereinafter defined)[5] are also entitled to dismissal of the lawsuit to the extent that it seeks disgorgement of fees. The NYFCA, like the federal False Claims Act, is not a general "all purpose" fraud statute (*Universal Health Services, Inc. v United States* [*Escobar*], 579 US 176, 194 [2016, Thomas, J.]) without provision for damages (*see* State Finance Law § 189 [1-3]). Although the damages prescribed by statute include consequential damages, they do not provide for restitution or recessionary damages.[6] Thus, the disgorgement of fees is simply not available as damages under the NYFCA.

---

[2] For completeness, the Court notes that the record is bereft of any evidence to support Relator's argument that NY was harmed because of a cap on permissible conduit financing. Among other things, there simply is no evidence that this cap was approached or that NY was prevented from doing any deal as a result of the alleged private conduit bond related NYFCA violations.

[3] A conduit bond is a municipal bond issued by a governmental entity on behalf of a private borrower which is generally referred to in the documents as the "Company," and hereinafter shall be referred to individually as the **Company**, and collectively, as the **Companies**. Typically, the government enters into a loan agreement with the Company "pursuant to which the Issuer [agrees] to loan the proceeds of the…Bonds to the Company and the Company [agrees] to make certain loan payments" (NYSCEF Doc. No. 1765 at 2) and other payments. On the fully developed record, it is the Company who pays the interest, principal, remarketing fees and letter of credit fees not the issuer government entity.

[4] To the extent a claim exists for these damages, these claims sounding in fraud belong to the Companies.

[5] The Defendants are collectively Merrill Lynch & Co., Bank of America Corporation, Bank of America, N.A., Banc of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., and BofA Merrill Lynch Asset Holdings Inc. (collectively, **BAML**), M&T Bank and M&T Bank Corporation (collectively, **M&T**), JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC (collectively, **JPM**), Morgan Stanley, Morgan Stanley & Co., LLC, Morgan Stanley Smith Barney LLC, Morgan Stanley Bank N.A., Morgan Stanley Capital Services, Inc., and Morgan Stanley Capital Group, Inc. (collectively, **Morgan Stanley**) and Citigroup, Inc., Citibank, N.A., Citigroup Global Markets, Inc., Citigroup Financial Products, Inc., and Citigroup Global Markets Holdings, Inc. (collectively, **Citi**).

[6] *Cf. People by James v Richmond Capital Group LLC*, 80 Misc 3d 1213(A) (Sup Ct 2023) (ordering disgorgement in connection with violation of the usury laws pursuant to New York Executive Law § 63 [12] which provides for the Attorney General of the State of New York to "bring a special proceeding for injunctive relief, restitution, and damages where a person or business engages in repeated or persistent fraud or illegality"); *see also U.S. ex rel. Taylor v Gabelli*, 2005 WL 2978921, *13-14 (SDNY Nov. 4, 2005) ("The Court must give effect to the clear and unambiguous text of the Act. This Act expressly provides for civil penalties and damages alone-and not for restitution. Moreover, governing precedents have typically construed FCA narrowly-permitting recovery when

---

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

**Page 4 of 44**

As discussed below, the Defendants however are not entitled to summary judgment dismissal of the claims involving the non-conduit bonds.

The branch of Relator's motion seeking summary judgment on the issue of materiality is granted. However, Relator is not entitled to the grant of summary judgment as to falsity or scienter. Trial is required as to those issues.

## THE RELEVANT FACTS AND CIRCUMSTANCES

This is a *qui tam* action brought by Relator alleging that each of the Defendants in this case violated the NYFCA by fraudulently representing that they had exercised required "professional judgment" in determining the "minimum rate of interest necessary…to enable [them] to remarket all of the [Variable Rate Debt Obligation Bonds (the **VRDOs**)]**…** at par plus accrued interest" (NYSCEF Doc. No. 1953 at 24-25) in connection with their demands for payment to NY (and certain Companies in the case of conduit bonds)[7] pursuant to certain remarketing agreements, indentures, interest rate obligations, and letters of credit—which, as discussed below, were each executed as part of an integrated transaction.

---

litigants sought actual damages, denying prejudgment interest, and ultimately looking with disfavor on consequential damages. No court has ever granted restitution-whether as disgorgement of profits or as contribution or indemnification-as a remedy under the Act and this Court declines to do so in this case…[i]n its elaborate remedial framework, the False Claims Act expressly provides for the trebling of actual damages sustained by the Government as a result of fraud in addition to civil penalties. The False Claims Act makes no provision whatsoever for the recovery of restitutionary remedies. Nor is any support for such relief to be found in the cases interpreting its legislative history. Thus, the False Claims Act does not permit the Relator to disgorge Defendants' profits…").

[7] *See United States ex rel. Grubea v Rosicki, Rosicki & Assoc., P.C.*, 318 F Supp 3d 680, 705 (SDNY 2018) (rejecting the argument that false claims submitted to Fannie Mae and Freddie Mac were not "claims" under federal False Claims Act because Fannie Mae and Freddie Mac were independent for-profit companies, noting that the act "applies as long as any portion of the claim is or will be funded by U.S. money"). *See also Wisconsin Bell*, 145 S Ct at 505-508 (affirming the principle that requests for payment can be "claims" under the FCA if the government furnished a portion of the money sought).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                                    **Page 5 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

[* 5]

The NYFCA imposes liability on any person or entity who:

    (a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

    (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

    (c) conspires to commit a violation of paragraph (a) [or] (b)…of this subdivision

(State Finance Law §§ 189 [1] [a–c]).

Previously, the Appellate Division held:

> Order, Supreme Court, New York County (Andrew Borrok, J.), entered March 30, 2020, which denied Defendants' motions to dismiss the complaint pursuant to CPLR 3016 (b) and 3211 (a) (1) and (7), and State Finance Law § 187, unanimously affirmed, without costs.

> To state a claim under the New York False Claims Act (NYFCA), found at sections 187-194 of chapter 56, article XIII of the State Finance Law, Relator in this *qui tam* action must allege facts showing that Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or local government (State Finance Law § 189 [1] [g]). State Finance Law § 192 (1-a) provides that, for purposes of applying CPLR 3016, a "qui tam plaintiff shall not be required to identify specific claims that result from an alleged course of misconduct, or any specific records or statements used, if the facts alleged in the complaint, if ultimately proven true, would provide a reasonable indication that one or more violations . . . are likely to have occurred, and if the allegations . . . provide adequate notice of the specific nature of the alleged misconduct to permit the state or a local government [to investigate and Defendants to defend]."

> The matters that Defendants characterize as pleading deficiencies are in the realm of "specific claims" or "specific records or statements" that qui tam plaintiffs suing under NYFCA are not required to plead. They argue that Relator has not identified a "single interest rate that was artificially inflated" or a "single false representation" as to any particular variable rate demand obligations (VRDO), but the motion court properly found that what Relator did allege, if proven true, "would provide a reasonable indication" (quoting State Finance Law § 192 [1-a]) that NYFCA was violated.

> Defendants argue that Relator's "entire claim" is based on its conclusion that they "engaged in 'robo-resetting,'" but the claim goes further, alleging that such "robo-resetting" was wrongly used, as Relator claims that its application resulted in the rates on VRDOs of disparate characteristics moving together. Defendants argue that no document

100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE
Motion No.  106 107 108 109 110 111 112 115 116 117

Page 6 of 44

required them to determine an objective lowest possible interest rate and that instead they were free to use their judgment and discretion, but Relator adequately alleged that they failed to exercise such judgment. Rather than accord separate treatment to each bond subseries, they are alleged to have bucketed VRDOs and treated them identically, sometimes for years, and without apparent economic justification, given the disparate characteristics of the VRDOs.

Nor did Relator simply assert in conclusory fashion that the bucketed bonds were dissimilar, but rather itemized the factors that made them so, for example, differences between the issuing State, relevant industry, purpose of the financing, and size of the debt. Defendants argue that the fact that interest rates might change in lockstep does not necessarily result in inflated rates, but Relator's allegations that Defendants' practices did result in inflated rates are supported by allegations based on its comparison of VRDOs to seven-day nonfinancial commercial paper.

Defendants take aim at that comparison, but their arguments are unavailing. They home in, for instance, on Relator's use of the words "rose above" to describe VRDOs' rates relative to the commercial paper's, pointing out that, instead, neither type of securities' rates "rose" at all, but instead suffered a decline over the period in question. However, their argument misses the point that despite declining rates as to both, the VRDO rates were nevertheless higher than the commercial paper rates, an allegedly marked departure from historical trends. To the extent Defendants raise arguments as to the inaptness of the analogy between the commercial paper and VRDOs in the first instance, those arguments are not suitable for determination on a motion to dismiss.

Scienter and materiality are adequately pleaded. Given the nature of the alleged misrepresentations and the underlying facts, Defendants would have been aware of their own failures to individually assess each VRDO and aware that they were instead treating them in buckets, collectively. Given the State's interest in keeping interest rates as low as possible, the complaint adequately alleges that the misrepresentations at issue, concerning Defendants' exercise of their judgment and discretion to set rates as low as possible consistent with what the market would bear, would have been material here.

For purposes of this motion to dismiss, Relator adequately alleges conspiracy. It was required to allege (1) that Defendants conspired with each other to get a false or fraudulent claim allowed or paid by the government; and (2) that one or more of them performed any act to effect the object of the conspiracy (*see United States ex rel. Grubea v Rosicki, Rosicki & Assoc., P.C.*, 318 F Supp 3d 680, 705 [SD NY 2018]). The complaint meets this standard, as it adequately alleges facts to show that Defendants set rates together, facts alleging "cross-bank" buckets, facts to show Defendants' aligned incentives, and facts showing how their ability to coordinate would have been facilitated by their interrelationships across VRDO transactions.

We also affirm the denial of the motions to dismiss Relator's claim to the extent it arises from the conduit VRDOs. Defendants have not shown, as a matter of law, that the state or local governments provided no portion of funds requested or demanded by Defendants in

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                 **Page 7 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

7 of 44

[* 7]

connection with these VRDOs (*see* State Finance Law § 188), notwithstanding that, as a general matter, a private company is often a conduit borrower.

False claims are actionable if the State provides any portion of the funds used to pay the false claims (*see Grubea*, 318 F Supp 3d at 705-706 [rejecting the argument that false claims submitted to Fannie Mae and Freddie Mac were not "claims" under federal False Claims Act because Fannie Mae and Freddie Mac were independent for-profit companies, noting that the act "applies as long as any portion of the claim is or will be funded by U.S. money"]).

The complaint sufficiently alleges that a portion of the funds the conduit borrower received came from the state. That the state's money passed to defendant M&T Bank Corporation through private VRDO borrower entities does not make the government any less its source. By issuing conduit bonds, the state "made the funds available," thereby "providing" money within the meaning of the New York False Claims Act (*see United States ex rel. Heath v Wisconsin Bell, Inc.*, 111 F Supp 3d 923, 926-927 [ED Wis 2015] [FCC "provided" money by mandating that common carriers pay into telecommunications services fund out of which subsidies were paid; "the government provided the money at issue in th(e) case despite the fact that the money (wa)s held in a private fund and administered by a private company"]).

The court's determination that government funds may have been implicated in the conduit VRDO transactions at issue here, and, in turn, that dismissal at the pleading stage was not appropriate, was not a matter of mere speculation, as Defendants contend, but instead a reasonable reading of relevant documents furnished, and assertions made, by M&T itself on its motion to dismiss. A sample loan agreement in which M&T served as a letter of credit provider stated that, upon issuance of the bonds at issue there, the "issuer," Town of Colonie Local Development Corp., "*shall lend* the proceeds thereof" (emphasis added) to the private nonprofit company involved in that transaction, Shaker Pointe at Carondelet, Inc., for certain purposes. Even more broadly, M&T, in its motion papers, acknowledged that, under conduit VRDOs, a "government entity issues the bonds, and then loans the proceeds from the bond issuance to the private entity for the private entity's project." Given the possible involvement of government funds in these financing transactions, the court appropriately declined to dismiss the NYFCA claim (and, in turn, the conspiracy allegations as to M&T) as to the conduit VRDOs at the pleading stage.

We have considered Defendants' remaining arguments and find them unavailing.

(*State ex rel. Edelweiss Fund, LLC v JP Morgan Chase & Co.*, 189 AD3d 723, 723-26 [1st Dept 2020]).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

**Page 8 of 44**

On the fully developed record following fulsome discovery, and as discussed more completely below, Relator has adduced copious persuasive contemporaneous evidence in satisfaction of each element of the claims brought under the NYFCA as against each of the Defendants (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). The Defendants' recently executed affidavits, which appear to be irreconcilably at odds with this sizable body of contemporaneous evidence raise issues of fact requiring trial as to the issues of falsity and scienter (*id.*). They do not establish a right to dismissal as a matter of law.

## I.      *The Relationship Between the Parties*

The Defendants were remarketing agents for the VRDOs of NY and the Companies. As remarketing agents, the Defendants were under a duty to act on behalf of NY and the Companies, using their judgment to obtain the minimum interest for each individual VRDO to clear at par. Although this might seem to suggest the existence of a fiduciary relationship, the Defendants as remarketing agents were not fiduciaries.[8] The Defendants often (but not always) provided letters of credit or a liquidity facility (each, an **LOC**) "to enable Borrower to receive the benefit of

---

[8] "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (*see HF Mgt. Services LLC v Pistone*, 34 AD3d 82, 84 (1st Dept 2006) [internal quotations and citations omitted]). The Municipal Securities Rulemaking Board's Rules and Interpretive Guidance provide that "no broker, dealer, or municipal securities dealer that has a financial advisory relationship with an issuer with respect to the issuance of municipal securities shall act as the remarketing agent for such issue…" and "unlike a municipal advisor, the underwriter does not have a fiduciary duty to the issuer under the federal securities laws…the issuer may choose to engage the services of a municipal advisory with a fiduciary obligation to represent the issuer's interests in the transaction" (MSRB Rules G-23 [e] & G-17 [Interpretive Guidance]). According to the Securities and Exchange Commission (the **Commission**), "[g]enerally, the Commission also would not consider a remarketing agent acting only in its capacity as a remarketing agent to be a municipal advisor because the mere remarketing of bonds likely would not constitute an issuance of municipal securities" (Registration of Municipal Advisors, 78 FR 67468-01) (*see also* Registration of Municipal Advisors, 78 FR 67468-01 n 633 ["A remarketing agent is a municipal securities dealer responsible for reselling to investors securities (such as variable rate demand obligations and other tender option bonds) that have been tendered for purchase by their owner. The remarketing agent also typically is responsible for resetting the interest rate for a variable rate issue and may act as tender agent"]. The Court notes that some of the remarketing agreements in the record explicitly disclaim fiduciary duties (*see* NYSCEF Doc. Nos. 1597 at 11 [BAML], 1776 at 9 [M&T], 1958 at 8 [Citi] and 1922 at 10 [Morgan Stanley]). Others do not (*see* NYSCEF Doc. Nos. 1596 [BAML], 2080 [JPM] and 1800 [Morgan Stanley]).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                          **Page 9 of 44**
 **Motion No.  106 107 108 109 110 111 112 115 116 117**

9 of 44

obtaining a favorable credit rating for the Bonds" (NYSCEF Doc. No. 1960 § 2.1) and to facilitate payment to the bondholders. As discussed below, the LOCs were drawn down on the day interest on the VRDO was due to the bondholders and required reimbursement payment from NY or the Company. The parties memorialized their relationship as to this integrated transaction in Remarketing Agreements, Indentures, and LOC and Reimbursement Agreements.

As discussed below, NY and the Companies paid remarketing fees in accordance with certain remarketing invoices pursuant to which the Defendants represented that they had performed the remarketing services, "in accordance with the Remarketing Agreement," (*see, e.g.,* NYSCEF Doc. No. 2777)[9] of exercising their professional judgment in obtaining the minimum rate which the VRDOs would clear at par. As discussed below, remarketing fees were generally calculated based on a percentage of the "weighted average aggregate principal amount" for a certain time period of applicable outstanding VRDOs (NYSCEF Doc. No. 1597 § 7).[10] NY and the Companies paid LOC fees based on a percentage of the credit amount supported by the LOC pursuant to certain LOC invoices that included identifying terms, such as "Letter of Credit # 69603729 The City of New York General Obligation Bonds Fiscal 2012 Series G, Subseries G-4 CUSIP: 64966JB54," "AMOUNT $100,863,014.00," "VALUE 10/1/2018," "MATURITY 1/1/2019," "# OF DAYS 92," "DAY BASIS 360," "FEE RATE 0.6000%," and "TOTAL $154,656.62" (NYSCEF Doc. No. 1968). Finally, NY and the Companies also paid interest on the VRDOs based on the presentation of certain rate reset notifications which rate reset

---

[9] As discussed below, the Court notes that the remarketing invoices did not all include the same exact magic words, however, they all nonetheless represented that the service of using their professional judgment in determining the "minimum rate of interest necessary…to enable [them] to remarket all of the [VRDOS]…at par plus interest" (NYSCEF Doc. No. 1953 at 24-25) had been provided.

[10] *See also* NYSCEF Doc. No. 1776 § 5 (M&T); NYSCEF Doc. No. 1838 § 7 (JPM); NYSCEF Doc. No. 1922 § 5 (Morgan Stanley); NYSCEF Doc. No. 1959 § 9 (Citi).

**100559/2014 EDELWEISS FUND, LLC, vs. JP MORGAN CHASE** **Page 10 of 44**
**Motion No. 106 107 108 109 110 111 112 115 116 117**

10 of 44

[* 10]

notifications represented the new remarketed rate and otherwise impliedly represented that each

of those rates were the result of the Defendants' required judgment as to each individual VRDO

(*see Escobar*, 579 US at 186 ["[i]n the court's view, a statutory, regulatory, or contractual

requirement can be a condition of payment either by expressly identifying itself as such or *by*

*implication*"]).[11]

## II. *The Indentures, Remarketing Agreements and LOC Agreements were part of an integrated transaction*

As discussed above, the parties memorialized the VRDO transactions in certain integrated

transaction documents, including, (i) an indenture, series certificate or resolution (each, an

**Indenture**, and collectively, the **Indentures**), (ii) a remarketing agreement (each, a

**Remarketing Agreement**, and collectively, the **Remarketing Agreements**) and (iii) an LOC

agreement (each, an **LOC Agreement**, and collectively, the **LOC Agreements**).[12]

### A. *The Indentures*

The Indentures, with some minor variations in language, require the Defendants to set each

interest rate at the lowest level which, in their judgment, would enable the VRDOs to be resold at

par. For example, one of Citi's Indentures provided:

> (b) **Determination of Weekly Variable Rate.** During each Weekly Variable Rate
> Period, the Remarketing Agent shall determine the Weekly Variable Rate for each Week
> not later than 4:00 p.m. Eastern time on each Rate Determination Date. *The Weekly
> Variable Rate shall be the minimum rate of interest necessary, in the professional*

---

[11] Inasmuch as the *Escobar* Court found that the bare bones invoices in that case represented both that the services were performed and impliedly represented that the parties providing the services had the required certifications and qualifications when the invoices themselves made no mention of such certifications (only the National Provider Identification numbers), the rate reset notifications easily satisfy the *Escobar* standard in that they represented that both the rate resets had occurred and also impliedly represented that such rate resets were the product of the Defendants' required professional judgment (*see Escobar* 579 US at 186).

[12] Some of the LOC Agreements include Fee Agreements and Reimbursement Agreements (*see, e.g.,* NYSCEF Doc. No. 1777).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                                    **Page 11 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

> *judgment of the Remarketing Agent, taking into consideration prevailing market conditions, to enable the Remarketing Agent to remarket all of the Bonds on the applicable Rate Determination Date at par plus accrued interest on the Bonds for that Week*.

(NYSCEF Doc. No. 1953 at 24-25 [emphasis added]).[13] Indeed, some of the Indentures explicitly required the Defendants to consider certain specific factors (to the extent applicable) when resetting rates. By way of example, one of M&T's Indentures stated that

> the Remarketing Agent shall take into account to the extent applicable (1) market interest rates for comparable securities held by tax-exempt open-end municipal bond funds or other institutional or private investors with substantial portfolios (a) with interest rate adjustment periods and demand purchase options substantially identical to the Bonds, (b) bearing interest at a variable rate intended to maintain par value, and (c) rated by a national credit rating agency in the same category as the Bonds, if the Bonds are at such time rated by a national credit rating agency, (2) other financial market rates and indices which may have a bearing on the Variable Interest Rate (including but not limited to rates borne by commercial paper, HUD project notes, Treasury Bills, commercial bank prime rates, certificate of deposit rates, federal funds rates, the London Interbank Offered Rate, indices maintained by The Bond Buyer, and other publicly available tax-exempt interest rate indices); (3) general financial and credit market conditions (including current forward supply); (4) factors particular to the Facility or the credit rating and financial condition of the Company and the LOC Bank and (5) applicable tender provisions which, in the best professional judgment of the Remarketing Agent, may have a bearing on the Variable Interest Rate for the Bonds during the next Adjustment Period.

(NYSCEF Doc. No. 2025 at 10).[14]

---

[13] *See also* NYSCEF Doc. No. 2025 at 10 (M&T); NYSCEF Doc. No. 1598 at Part 1-8 (BAML); NYSCEF Doc. No. 1837 at 29-31 (JPM); NYSCEF Doc. No. 1929 at 13-14 (Morgan Stanley).

[14] The record does not include contemporaneous notes or anything like that by the Defendants' rate resetters with respect to each of the VRDOS or their many rate resets supporting their conclusory statements in their recently executed affidavits that these factors were considered or that individual consideration of the VRDO rate resets occurred. The contemporaneous internal documents suggest the opposite and support Relator's position that rate setting *en masse* occurred without the exercise of the required judgment as to each individual VRDO and that the Defendants were more motivated by clearing their own inventory than in ensuring that NY and the Companies maintained the lowest borrowing costs based on, in the professional judgment of the Defendants, the VRDOs clearing at par. In this regard, notably, the Indentures do not specifically provide for consideration of the rate necessary to clear current inventory.

The Indentures also require the Defendants, as remarketing agents, to provide notice of its variable interest rate determinations to NY or the Company. For example, a BAML resolution requires BAML to "immediately give notice of the determination of any Daily Rate pursuant to this Section to the Corporation,[15] the Mortgagor, the Trustee, the Tender Agent, and the Credit Issuer by telecopy or other similar means of electronic communication…" (NYSCEF Doc. No. 2930 at A-12 and A-14).[16]

### B. The Remarketing Agreements

The Remarketing Agreements, executed by the issuers (NY) or by or on behalf of the Companies (in the case of conduit bonds) and the Defendants as remarketing agents, incorporate the obligations set forth in the Indenture including the obligation to exercise their judgment in obtaining the lowest possible rate for the VRDO to clear at par. For example, a JPM remarketing agreement provides in relevant part that "[t]he execution and delivery by the Remarketing Agent of this Remarketing Agreement shall constitute the acceptance by the Remarketing Agent of its duties and obligations under the Indenture. The Remarketing Agent shall perform such duties and obligations imposed upon it as remarketing agent under the Indenture" (NYSCEF Doc. No. 1838 at 5).[17] The Remarketing Agreements also set forth the fees for remarketing services and require the Defendants to provide remarketing services in accordance with its obligation set forth in the Indenture. For example, Section 5 of a Morgan Stanley remarketing agreement provides:

---

[15] "Corporation" is defined in the remarketing agreement as "the New York City Housing Development Corporation, or any body, agency or instrumentality of the State which shall hereafter succeed to the powers, duties and functions of the Corporation" (NYSCEF Doc. No. 2930 at 4).

[16] *See also* NYSCEF Doc. No. 1775 at 89 (M&T); NYSCEF Doc. No. 2954 at A-3 and A-14 (Citi); NYSCEF Doc. No. 2973 at 15 (Morgan Stanley). JPM's notice requirement came from its Remarketing Statements one of which stated, "[t]he Remarketing Agent shall give Notice to the Agency and the Trustee of the Weekly Rate…" (NYSCEF Doc. No. 3185 at 19-20).

[17] *See also* NYSCEF Doc. No. 1597 at 1 (BAML); NYSCEF Doc. No. 1776 § 2 (M&T); NYSCEF Doc. No. 1921 at 1 (Morgan Stanley); NYSCEF Doc. No. 1958 at 1 (Citi).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE** **Page 13 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

[f]or the Remarketing Agent's services under this Agreement and the Resolution, the Issuer will pay the Remarketing Agent a fee of .075 of 1% per annum of the weighted average of the principal amount of the Applicable Bonds. The Issuer will pay the fee quarterly in arrears commencing July 1, 2008, and each October 1, January 1, April 1 and July 1 thereafter. When Applicable Bonds are remarketed in connection with the conversion of the interest rate to a Term Rate or a Fixed Rate, the Issuer and the Remarketing Agent will agree on a fee.

The Issuer will pay all expenses of delivering remarketed Applicable Bonds and reimburse the Remarketing Agent for all direct, out-of-pocket expenses incurred by it as Remarketing Agent, including reasonable counsel fees and disbursements.

(NYSCEF Doc. No. 1922 § 5). As discussed in this Decision and Order, invoices were presented for payment with the representation that they were demands for payment for services rendered in accordance with the Remarketing Agreements which services were the exercise of the required professional judgment at issue in this case with respect to each VRDO interest rate reset.

### C. *The LOC Agreements*

As discussed above, in respect of some of the VRDOs, the Defendants also provided LOCs to help NY and the Companies hedge against short-term liquidity risks and "to enable Borrower to receive the benefit of obtaining a favorable credit rating for the Bonds" (NYSCEF Doc. No. 1960 § 2.1). Pursuant to the LOC Agreements,[18] executed by NY or by or on behalf of the Companies and the LOC bank (the defendant), NY or the Company was to pay a fee for these services, typically quarterly or annually. For example, pursuant to Section 2.13(a) of a Citi agreement, the "[b]orrower shall pay…a per annum fee (the 'Letter of Credit Fee') equal to 60 basis points (.60%) times the actual daily amount of the Maximum Committed Amount of the Credit Facility, (regardless of usage" (NYSCEF Doc. No. 1960 § 2.13 [a]).[19]

---

[18] *See, e.g.,* NYSCEF Doc. No. 3043 § 2.02 (Morgan Stanley).

[19] *See also* NYSCEF Doc. No. 1777 § 2.7 (c) (M&T); NYSCEF Doc. No. 1600 § 2.06 (BAML).

The LOCs also facilitated interest payments (which interest rates were required to be in the judgment of the Defendants, at the lowest possible rate which would clear at par) on the VRDOs. On the date when interest was required to be paid to the bond holder, the LOC was drawn down and NY or the Company would then reimburse the LOC facility for the amount drawn. For example, Section 2.9 of a Citi agreement states, in relevant part:

> Payment or principal on the Bonds which is due and payable either at scheduled maturity, or on redemption or acceleration (but not in connection with a purchase of the Bonds) shall be effected through A Drawings by Bond Trustee under the Letter of Credit. Payment of interest on the Bonds as the same becomes due and payable (but not in connection with a purchase of Bonds) shall be effected through B Drawings by Bond Trustee under the Letter of Credit. Payment of the purchase price in respect of principal and interest on the Bonds shall be effected through C Drawings by Bond Trustee under the Letter of Credit. L/C Issuer shall honor each draw made by Bond Trustee under the Letter of Credit in the manner and within the time period specified in the Letter of Credit. Borrower absolutely and unconditionally agrees to reimburse L/C Issuer, on the day on which is made an A Drawing, a B Drawing or a C Drawing, if such C Drawing is made during the continuance of an Event of Default under this Agreement (a "Default C Drawing"), for each A Drawing, B Drawing or Default C Drawing honored by L/C Issuer under the Letter of Credit, together with (if any such A Drawing, B Drawing or Default C Drawing is not reimbursed on the same day) interest thereon calculated as provided in Sections 2.20 and 2.21 from and including the date any such A Drawing, B Drawing or Default C Drawing is honored by L/C Issuer to, but not including, the date upon which the amount of any such A Drawing, B Drawing or Default C Drawing is fully reimbursed by Borrower to L/C Issuer. Borrower absolutely and unconditionally agrees to reimburse L/C Issuer for each C Drawing other than a Default C Drawing (a "Remarketing C Drawing") honored by L/C Issuer under the Letter of Credit to the extent not immediately reimbursed out of remarketing proceeds, together with interest thereon calculated in accordance with Sections 2.17 and 2.18 as follows…

(NYSCEF Doc. No. 1960 § 2.9).[20]

### III. The Defendants Presented Three Types of Claims Under the NYFCA

The NYFCA defines "claim" as

---

[20] *See also* NYSCEF Doc. No. 1777 § 2.3 (M&T). As discussed below, to the extent that there was a delta in the amount drawn down (and reimbursed) and the amount that should have been drawn down (and reimbursed) had the rate (borrowing cost) been lower based on the proper exercise of the required judgment by the Defendants, this amount would constitute inflated interest damages.

any request or demand, whether under a contract or otherwise, for money or property that

(i) is presented to an officer, employee or agent of the state or a local government; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded…

(State Finance Law § 188 [1]).  The remarketing invoices, liquidity fee invoices and rate reset notifications were each a "claim for payment" (State Finance Law §§ 189 [1]).

### A. *The Remarketing Invoices*

Although the specificity of language of the remarketing invoices is not entirely uniform from invoice to invoice, each "presented a claim for payment or approval" or were "statements material to a false or fraudulent claim" (State Finance Law §§ 189 [1] [a-b]).  Some which were presented for payment for the Defendants' remarketing services, indicated the amount due for those services and the name or CUSIP number of the relevant bonds.[21]  Others included more information, such as the relevant time period for which the fees applied,[22] and the  representation that the remarking invoices were "per the Remarketing Agreement dated…" or "in accordance with the Remarketing Agreement…"[23]  Finally, others refer to remarketing "Services" with a capital S (suggesting a defined term [but not including the definition in the documents themselves]),[24] the amount of the bond(s)[25] or some combination of the foregoing.  In any event,

---

[21] *See* NYSCEF Doc. No. 1778 (M&T).
[22] *See* NYSCEF Doc. No. 2039 (M&T); NYSCEF Doc. No. 1969 (Citi); NYSCEF Doc. No. 1935 (Morgan Stanley).
[23] *See* NYSCEF Doc. Nos. 2777 and 2243 (BAML); NYSCEF Doc. No. 1875 (JPM); NYSCEF Doc. No. 2039 (M&T).
[24] *See* NYSCEF Doc. No. 1875 (JPM).
[25] *See* NYSCEF Doc. No. 1969 (Citi).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                                      **Page 16 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

16 of 44

and as discussed above, under the totality of the circumstances, all were claims made under the NYFCA representing that the Defendants had performed the remarketing service of exercising the required judgment to obtain the minimum rate (lowest borrowing costs) that the VRDOs would clear at par.

### B. The Rate Reset Notifications

The Defendants sent rate reset notifications to NY and the Companies pursuant to the applicable Indenture as discussed above.[26] As relevant, these too were claims within the meaning of the NYFCA in that they too were "presenting a claim for payment or approval" or were "statements material to a false or fraudulent claim" (State Finance Law §§ 189 [1] [a-b]) because they triggered payment of the amount of interest due to the bond holders by the issuers or Companies. In fact, and like the claims in *Escobar*, they actually had two representations. They represented that the rates had been reset and at the levels set forth in the rate reset notifications,[27] and they also impliedly represented that those reset rates were, based on the judgment of the Defendants, the minimum rates that the applicable VRDOs would clear at par.[28]

### C. The Liquidity Fee Invoices

The Defendants also submitted separate LOC invoices, each as a "claim for payment or approval" (State Finance Law §§ 189 [1] [a]). Like the rate reset notifications and the claims in

---

[26] *See* NYSCEF Doc. No. 1941 (Morgan Stanley); NYSCEF Doc. No. 1971 (Citi); NYSCEF Doc. No. 1876 (JPM); NYSCEF Doc. No. 1780 (M&T); NYSCEF Doc. No. 1614 (Citi).

[27] This representation appears to be true—the rate was reset at the level set forth in the rate reset notification.

[28] As discussed below, there is substantial evidence in the record that this representation appears to be false and fails to disclose non-compliance with the "contractual obligation" (*See Escobar*, 579 US at 190 ["the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths"]).

100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE                                    Page 17 of 44
Motion No.  106 107 108 109 110 111 112 115 116 117

17 of 44

[* 17]

*Escobar*, the LOCs also included two representations. The LOC invoices represented that the liquidity service had been provided in the Maximum Amount of the Credit Facility regardless of usage per the language of the LOC invoices, [29] and also impliedly represented that the Defendants had exercised the requisite judgment in obtaining the lowest rate that the VRDOs would clear at par, triggering the use of the LOC to make the VRDO bondholder payment and requiring reimbursement from the issuer or the Company (*Escobar*, 579 US at 181 ["liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading"]). The LOC invoices included, at minimum, reference to specific credit support instruments (by letter-of-credit number), the size of the liquidity facility (typically based on the size of the underlying VRDO issuance(s)), the total fees due for the facility and the period of time covered by the invoice.[30] Some of the LOC invoices demanding payment also included reference to specific VRDOs (by name or CUSIP number).[31]

### IV. Materiality

The NYFCA defines "material" as "a natural tendency to influence, or be capable of influencing the payment or receipt of money or property" (State Finance Law § 188 [5]). "Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of

---

[29] This representation appears to be true – the LOC was provided as to "Maximum Amount of the Credit Facility regardless of usage." The record evidence does however suggest that the implicit representation that the LOC was drawn to facilitate payment of the interest rate that was the product of the Defendants' required judgment appears to be false.

[30] *See* NYSCEF Doc. No. 1873 (JPM); NYSCEF Doc. No. 1610 (BAML); NYSCEF Doc. No. 1779 (M&T); NYSCEF Doc. No. 1940 (Morgan Stanley).

[31] *See* NYSCEF Doc. No. 1968 (Citi).

100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE
Motion No.  106 107 108 109 110 111 112 115 116 117

Page 18 of 44

18 of 44

[* 18]

the recipient of the alleged misrepresentation" (*Escobar*, 579 US at 193 [internal quotations and brackets omitted]). In assessing materiality, federal courts utilize a "holistic, totality-of-the circumstances inquiry," examining various factors, including "(1) whether the government has expressly designated the legal requirement at issue as a condition of payment; (2) whether the alleged violation is minor or insubstantial or goes to the essence of the bargain; and (3) whether the government made continued payments or does so in the mine run of cases despite actual knowledge of the violation" (*United States v Care Alternatives*, 81 F4th 361, 367 [3d Cir 2023] [internal citations omitted] [citing *Escobar*]). Lastly, courts look to the contract's purpose and whether the defendants' noncompliance deprived the government of the intended benefits of the contract (*Fed. Deposit Ins. Corp. v Fifth Third Bank, N.A.*, 23-209-CV, 2023 WL 7130553, at *4 [2d Cir Oct. 30, 2023]). In fact, on remand, the United States Court of Appeals for the First Circuit (the **1st Cir**) in applying the demanding standard of materiality held that the misrepresentations in *Escobar* were material explaining, *inter alia*,

> [w]hile we recognize that the FCA is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations," Escobar II, 136 S.Ct. at 2003, UHS's alleged misrepresentations were not garden-variety breaches. At the core of the MassHealth regulatory program in this area of medicine is the expectation that mental health services are to be performed by licensed professionals, not charlatans. To use the Civil War-era example cited at oral argument in Escobar II, UHS's violations in the instant case are as central to the bargain as the United States ordering and paying for a shipment of guns, only to later discover that the guns were incapable of firing. Id. at 2001.

(*United States ex rel. Escobar v Universal Health Services, Inc.*, 842 F3d 103, 111 [1st Cir 2016]).

As discussed above, the Appellate Division previously held that "[g]iven the State's interest in keeping interest rates as low as possible, the complaint adequately alleges that the

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**
Motion No.  106 107 108 109 110 111 112 115 116 117

**Page 19 of 44**

19 of 44

misrepresentations at issue, concerning Defendants' exercise of their judgment and discretion to set rates as low as possible consistent with what the market would bear, would have been material here" (*Edelweiss*, 189 AD3d at 725).

The fully developed record confirms the veracity of the allegations that the quintessential element of the VRDO transaction was the requirement that the Defendants, as remarketing agents, provide the required service of exercising their professional judgment in obtaining the lowest interest rate possible that would allow the VRDOs to be resold at par (*i.e.*, to keep borrowing costs as low as possible) and that the alleged failure to provide the service of exercising the required judgment was material. Deposition testimony,[32] correspondence[33] and internal documents from the Defendants and Relator, among other evidence of materiality adduced by Relator, establish that each basis point was critical to NY and the Companies.[34]

Thus, although true that continued payment can be "strong evidence" of a lack of materiality (*Escobar*, 579 US at 195), it is not dispositive. In this case, the record indicates that the Defendants corrected the improper rates by lowering them when NY and the Companies complained (*i.e.*, identified the discrepancies between what a rate was set at and what the rate

---

[32] *See* NYSCEF Doc. No. 2176 at 120 (BAML); NYSCEF Doc. No. 2020 at 247 (M&T); NYSCEF Doc. No. 1789 at 34 (Morgan Stanley); NYSCEF Doc. Nos. 1646 at 88-89 (Citi).

[33] *See* NYSCEF Doc. Nos. 2247 (BAML), 2085, 2086 (JPM), 2032 (M&T) and1828 (Morgan Stanley).

[34] Indeed, Kenneth Rogers, BAML's primary VRDO rate resetter from 1995 until 2010 admitted that "[t]o the issuer clients, that's really the only thing that mattered; what's my rate. That's my interest expense" (NYSCEF Doc. No. 2172 at 63). According to a witness for the New York Local Government Assistance Corporation who used JPM, a single basis points mattered because "***our goal is to have you know, the lowest rate possible to reduce our interest cost over the life of those bonds***" (NYSCEF Doc. No. 2076 at 49 [emphasis added]). In a letter to the NYS Office of the Attorney General, M&T stated that "[f]or a borrower seeking to finance a project often in the tens of millions of dollars, the pricing is obviously a critical consideration. ***So in a broad sense, the raison d'être of a VRDO structured finance solution is to benefit the borrower by reducing the interest expense relative to other potential financing solutions (such as a traditional loan)***" (NYSCEF Doc. No. 2026 at 1 [emphasis added]).

100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE                    Page 20 of 44
Motion No.  106 107 108 109 110 111 112 115 116 117

20 of 44

was set at on other similar securities) and gave further assurances that the required service would be properly provided in the future. In other words, and to use the Civil War-era example cited in *Escobar* and to borrow and expand on the analogy set forth by the 1st Cir in *Escobar* on remand, this is the same as if NY (or the Companies) ordered a shipment of guns, later discovered that they could not fire, and then following complaint of the material defect to the maker, the maker corrected the guns so that they could fire and provided further assurances that future firing issues would not occur. As such, it is simply of no moment that continued payments were made for future invoices given the Defendants' admissions and concessions. Indeed, the continued future payments may only be evidence under the circumstances of the fact that NY and the Companies did not appreciate that the alleged lack of the required judgment in this case was not merely a "one-off" or outlier mistake as to a particular rate reset. [35] Given the substantial evidence of collusion and conspiracy in the record, it is also not clear that there were tax free variable rate market alternative providers to do the rate resets. As to new bonds, among other things, the rate on a taxable bond alternative would have necessarily been higher and NY or the Company would have paid more in its borrowing costs – which is the exact opposite of the "*raison d'être*" of the VRDO transaction.[36] Thus, under these circumstances, continued payment does not create an issue of fact much less establish a lack of materiality as a matter of law.

### V.    *Falsity*

---

[35]  *See United States ex rel. Escobar v Universal Health Services, Inc.*, 842 F3d at 112 (the 1st Cir holding that the government's continued payments after the FCA case was filed, did not establish non-materiality because, among other things, "mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance").

[36]  *See* NYSCEF Doc. No. 2248 (Relator's expert explains that "[t]ax-free investments, including VRDOs, should bear lower interest rates than comparable taxable investments, reflecting the benefit investors gain from the combined federal, state, and local tax exemption"). It is thus irrelevant how certain fact witnesses answered certain objected to (and impermissible and inadmissible) legal questions calling for legal conclusions at certain depositions.

100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE                     Page 21 of 44
  Motion No.  106 107 108 109 110 111 112 115 116 117

21 of 44

The NYFCA defines a false claim as "any claim which is, either in whole or part, false or fraudulent" (State Finance Law § 188 [2]).  Claims can be either "factually" false or "legally" false (*United States v Visiting Nurse Serv. of New York*, Med & Med GD (CCH) P 306121 [SDNY Sept. 26, 2017]).  "The archetypal FCA claim is a factually false one that involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided" (*id.* at 6 [internal quotations omitted]).

The record is also permeated with evidence that the claims falsely represented that the Defendants had performed the remarketing service of exercising the required judgment in obtaining the lowest possible rate that each individual VRDO could clear at par.  Indeed, Relator adduces substantial evidence that the Defendants followed the practice of setting rates *en masse* in buckets ***to clear inventory*** (putting their own interests ahead of their obligation to NY and the private issuers) and not based on similar security characteristics such that those groupings would be appropriate.  For example, Citi's former rate resetter testified that "inventory levels, where daily inventory and daily rates have been trending going up to the reset – going up to the next reset rate, those were definitely the main factors for me.  All other factors, although they are factors, were probably more secondary in nature" (NYSCEF Doc. No. 1646 at 187).[37] According to James Brewer (NYSCEF Doc. No. 2187), BAML's principal rate resetter from 2010 to 2018, Mr. Brewer provided instructions to backup rate resetters for how to set VRDO rates in BAML's system when he was out of office.  The instructions provided, in relevant part, as follows:

> TO SET RATES:

---

[37] As discussed above, this was not a factor that the parties agreed was to be a "main factor." *See also* NYSCEF Doc. Nos. 2105, 2107 and 2108 (JPM); NYSCEF Doc. Nos. 1804, 2747, 2748, 2749 and 2750 (Morgan Stanley); NYSCEF Doc. No. 2813 at 38-39 (BAML); NYSCEF Doc. Nos. 2021 and 2047 (M&T).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**          **Page 22 of 44**
    **Motion No.  106 107 108 109 110 111 112 115 116 117**

In QRATE
Change AM/PM

MAKE ADJUSTMENTS — Under the Tools dropdown there is the BASE Matrix and VALUATION Matrix - probably safer to change the BASE Matrix before making any other changes. In the VALUATION Matrix, use the drop down in the upper left and go to BUCKET NAME — this allows you to change bucket spreads. If you make changes to the Base or Valuation Matrix hit update on the bottom of the screen. To change an individual security go the TRADER column on QRATE and change the trader spread. After changes are made hit RECALC on QRATE screen.

Once rates are updated:
<click> PUBLISH. The rate sync screen will come up —just close it.

…

BUCKETS:
Richest on top – never price the issue better then [sic] the one above – they can be the same but not thru

(NYSCEF Doc. No. 2187 at 2-).

Additionally, deposition testimony of Mr. Brewer provided, in relevant part, as follows:

Q. Can you recall any circumstances in which one would not have been placed into a bucket?
A. Not – not particularly, but I know from time to time we did have securities that were not in buckets; not very often.
Q. Did you make an effort to identify VRDOs that were not in the bucket and try to find a bucket that they could fit into?
MR. BENEDETTO: Object to form.
A. If there is a bucket that they could fit into, we put them in that bucket. But if there was not a bucket that they fit into, we just create a bucket for that security. So we have a bucket just so, you know, kind of – when you're thinking about buckets, you're thinking about where this credit issue fits in in the – you know, relative to all the other VRDOs. So, you know, having sort of categories and buckets, because each bucket represents a category that makes sense, if it does fit into a bucket, you should put it in a bucket.

(NYSCEF Doc. No. 2810 at 68-69).

In fact, Citi utilized an excel spreadsheet (NYSCEF Doc. No. 1665) with a base rate and preset formula (if setting rates in bucket at one basis point above the base rate, for example, the formula was =$A$3+0.01) to reset rates for large swaths of VRDOs which seemingly are unrelated (from different areas of the country and with different credit support).

To be clear, it was not only Citi and BAML who engaged in the practice of *en masse* rate resets. Morgan Stanley and the other defendants did it too (NYSCEF Doc. No. 1806). Bradley Wendt, Relator's expert, explains how certain of Morgan Stanley's VRDOs with dissimilar characteristics were reset "at the same increment or decrement" from quarter to quarter (NYSCEF Doc. No. 1806; NYSCEF Doc. No. 2153 at 148). Mr. Wendt also analyzed JPM's alleged bucketing practices and found that rates for VRDOs with dissimilar characteristics moved in lockstep with one another (NYSCEF Doc. No. 2153 at 146 and 160). Mr. Wendt found similar discrepancies for M&T as well (NYSCEF Doc. No. 2153 at 169).

The Defendants also limited the pool of potential purchasers, selling primarily or exclusively to money market funds. For example, a Citi document indicated that the bank "stopped offering VRDNs to retail investors after the financial crisis" (NYSCEF Doc. No. 1674).[38]

The record evidence suggests that the Defendants also allocated insufficient resources to the rate resetting process. By way of example, Mr. Brewer testified that as primary rate resetter for BAML, he was responsible for resetting rates on "around 1,000 weekly VRDOs" and 100 to 130 daily-reset VRDOs and that once the primary rate resetter reset the rates, the rates were

---

[38] *See also* NYSCEF Doc. No. 1675 (Citi); NYSCEF Doc. No. 2022 at 38-39 (M&T); NYSCEF Doc. No. 2168 at 171 (BAML); NYSCEF Doc. No. 2067 at 76-77 (JPM); NYSCEF Doc. No. 1791 at 147 (Morgan Stanley).

100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE                                    Page 24 of 44
Motion No.  106 107 108 109 110 111 112 115 116 117

24 of 44

effectively final, meaning nobody else at BAML reviewed or signed off on them (NYSCEF Doc. No. 2169 at 45, 237-238).[39]  Additionally, Stephanie Kercher, an M&T rate resetter testified that she spent just "zero to 30 minutes" resetting their 271 national VRDO weekly programs, amounting to about 7 seconds for each individual VRDO (NYSCEF Doc. No. 2021 at 151; *see also* NYSCEF Doc. No. 2058 at 89).

Thus, although the Defendants now assert that they would, on a regular basis, make individual changes after resetting the rates *en masse*, the overwhelming contemporaneous evidence indicates that the opposite is true.  There is almost no contemporaneous evidence in the record suggesting that this in fact occurred (except, it appears, for the most part, when NY or the Company complained that the rate was too high compared to other similar securities such that the Defendants admitted the same by lowering the rate).  According to Relator's expert, Mr. Wendt,

> [p]er Defendants' testimony, if in fact one hour was spent resetting 1,400 national VRDOs (Defendants' average number of VRDO programs), then, on average, the remarketing agent has less than 3 seconds to (i) examine comparable tax-free obligations that were priced under then-prevailing market conditions, (ii) determine a rate for each individual VRDO, and (iii) then determine whether each individual VRDO is set at the lowest interest rate for that VRDO

(NYSCEF Doc. No. 1698 at 54), suggesting a near impossibility that individualized treatment was a regular practice.

### VI.     Collusion

---

[39] *See also* NYSCEF Doc. Nos. 1804 at 37-38 (Morgan Stanley); NYSCEF Doc. Nos. 2103, 2064 at 31, 71-75 (JPM); NYSCEF Doc. No. 1646 at 81 (Citi). This too does not appear to be authorized or consistent with the obligations set forth in the transaction documents.

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                                          **Page 25 of 44**
  **Motion No.  106 107 108 109 110 111 112 115 116 117**

25 of 44

[* 25]

Relator also adduces substantial evidence of collusion among the Defendants in the setting of the VRDOs rates based on what the others were planning and not based on what the market would bear—*i.e.,* not based on their judgment that the rates set were the lowest rate that the VRDOs would clear at par.[40]

Indeed, among other evidence, the fully developed record demonstrates the sharing of information through third parties, including Joseph Luparello, who was a former employee of Standard & Poor's (S&P). Mr. Luparello conspired with the Defendants in setting rates on the VRDOs. He did so by soliciting from BAML, Citi, JPM and other non-defendant banks and inquiring where the banks planned to reset rates the following day on a specific weekly VRDO for the invitation only PARS Index made up of five-to-seven members. Critically, then, he would share not only the aggregate index numbers but also the component parts that each Defendant[41] member had supplied prior to that information becoming public (so that those Defendants in fact knew what each of the others was doing) and prior to the time that the Defendants finalized their rate reset on each VRDOs.[42] The record suggests that this explains why rate resets were done in the short time period in which they were done and why the contemporaneous internal documents describing the manner in which rate resets should occur do not reflect the requirements for individual VRDO rate reset reviews.

---

[40] This not only suggests that the claims made were false but also that the Defendants had the required scienter in that the Defendants actually knew the information upon which the claims were based was false, or otherwise acted in deliberate ignorance or reckless disregard of the truth or falsity of the information (*see* State Finance Law § 188 [3] [a]; *Total Asset Recovery Services LLC on behalf of State v Metlife, Inc.*, 189 AD3d 519, 522 [1st Dept 2020]).

[41] Although the record is not clear as to whether Morgan Stanley was an actual member of the PARS Index, the record firmly establishes Morgan Stanley's collusion with Wells Fargo and Goldman Sachs (two members of the PARS Index; *see* NYSCEF Doc. Nos. 1817, 1818). And, in fact, according to Mr. Luparello he shared his information from the JJ Kenny Index with Morgan Stanley (NYSCEF Doc. No. 1821 ¶ 27).

[42] *See* NYSCEF Doc. No. 2221.

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                                    **Page 26 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

26 of 44

According to Mr. Luparello:

4.      From approximately 1995 through January 2013, I was responsible for computing and circulating short term indexes for variable rate bonds at JJ Kenny, including the PARS, High Grade, Intermediate, and Low Grade Indexes. These indexes were associated with Variable Rate Demand Obligations, or "VRDOs." These indexes were already in existence when I assumed responsibility for computing and circulating them.

5.      During the time I was responsible for the PARS Index, there were at any given time approximately five to seven banks contributing rate reset data to the Index. The PARS Index was the average of those rates.

6.      The PARS Index related to VRDOs, the rates for which were reset weekly.

7.      The VRDOs for which each remarketing agent contributed weekly rate reset data to me each Tuesday afternoon were bonds that were reset on a Wednesday.

8.      The remarketing agents would typically provide me with information on late Tuesday afternoon regarding the rate each remarketing agent would set the next day on one specific high-grade VRDO that would be representative of the better quality VRDOs in their portfolios.

9.      Each remarketing agent reported rates on a particular CUSIP unless, for example, the bond matured. In that case, the remarketing agent would choose another high-grade VRDO for purposes of reporting its rate reset for the PARS Index.

10.     After receiving the remarketing agents' rate reset information late Tuesday afternoon, I would compute the average of the five to seven rate resets the contributing remarketing agents had provided to me, and that number was the PARS Index for that week.

11.     Later on Tuesday, I would telephone or email the PARS Index average to the remarketing agents that contributed the rate reset data, typically providing the breakdown of those rates contributed by each remarketing agent. I did not, however, identify which specific remarketing agent contributed which specific rate resets. For example, attached as Exhibit A is an email chain from Tuesday, August 28, 2012, between me and Rick White of Wells Fargo which generally demonstrates how the PARS Index worked. Early that day, Mr. White sent me an email indicating that the rate that would be reset the following day for the CUSIP Wells Fargo used for PARS purposes would be 0.18. Later that day, after having received the rates each of the other PARS participants would be resetting the next day for their respective CUSIPs, I sent an email to Mr. White indicating that the PARS Index on that day was 0.17, based on one participant's submitted rate of 0.15, another at 0.16, two at 0.17, and three at 0.18. it was my practice to send a similar email to each of the PARS participants who contributed their rates.

[* 27]

12. Thus, the PARS Index allowed each remarketing agent to know how the interest rate rest for their CUSIP compared to the rate resets of the other contributing remarketing agents in advance of the actual reset dates.

13. The remarketing agents who contributed rate resets to me for the purpose of compiling the PARS Index knew who the other participating remarketing agents were.

14. The distinguishing features of the PARS Index are that it was based on real CUSIPS, used actual rate resets, and the rates the remarketing agents reported on a Tuesday were the actual rates they reported to the MSRB and the market the next day.

15. During the time I computed and circulated the PARS Index, the remarketing agents who contributed CUSIP rate reset data to me and who received the PARS average varied. To the best of my recollection, this group included, at various times, the following individuals at the different financial institutions: [43]

   A. JP Morgan, through Betty Infantes and Peter McCarthy;[44]
   B. Citi, through Robert Toascanini and Chris Dimon;
   C. Barclays, through Rommel Medina;
   D. Bank of America Merril Lynch, through Mona Payton and Jim Brewer;
   E. Piper Jaffray, through Kimberly Cleary and Joanna Brody;
   F. Wells Fargo, through Rick White;
   G. Goldman Sachs, through Cynthia Klein
   H. UBS, through JoAnn Mugavero.

16. The PARS Index figures I circulated on Tuesday closely matched the SIFMA Index released on Wednesday.

17. The recipients of the PARS Index included all of the remarketing agents that contributed rate reset data to me for compilation of the Index, as well as a small number of paying subscribers. The remarketing agents that submitted rates by which the PARS Index was calculated did not pay to subscribed to the PARS

---

[43] According to Mr. Luparello, Morgan Stanley, through J.R. McDermott and Dan Kelly, was part of the JJ Kenny Index (NYSCEF Doc. No. 2221 ¶ 27) which was "usually pretty close, and sometimes identical" to the PARS Index (NYSCEF Doc. No. 2221 ¶ 28). As discussed below, evidence in the record establishes that Andrew Rowley from Morgan Stanley provided the breakdown of six component parts ("19 x 1" "20 X 3" "21 X 2") to Goldman Sachs— the PARS Index included "approximately five to seven banks contributing rate reset data to the Index" compared to the JJ Kenny Index where he would call "between 10 and 12 banks" (NYSCEF Doc. No. 2221 ¶¶ 5, 10, 23). In any event, and as discussed below, the evidence in the record establishes that Morgan Stanley engaged in this collusive practice with respect to the JJ Kenny Index such that under the circumstances it is irrelevant whether Morgan Stanley was an actual member of PARS.

[44] In his declaration, Mr. Luparello also indicates that on October 11, 2012, Kyle Pulling sent an email to him on behalf of JPM stating that the bank no longer "wanted to receive the High Grade of Intermediate Index" (NYSCEF Doc. No. 2221 ¶ 32).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                    **Page 28 of 44**
 **Motion No. 106 107 108 109 110 111 112 115 116 117**

[* 28]

28 of 44

Index. To the best of my recollection, there were not more than approximately five paying subscribers at any given time. The paying subscribers to the PARS Index received the PARS Index on Wednesdays.

18.     Persons and entities that had not paid to subscribe to the PARS Index were not supposed to be privy to the PARS numbers, and not many on the Street involved in VRDOs knew that the PARS Index existed or what PARS was.

(NYSCEF Doc. No. 2221 ¶¶ 4-18).

The record establishes that another index, the JJ Kenny High-Grade Index (the **JJ Kenny Index**) operated exactly the same way—Mr. Luparello would contact rate resetters from Citi, BAML, JPM and Morgan Stanley and ask where they planned to set rates for high grade bonds the following day.  Mr. Luparello would then circulate the average, and sometimes the component parts, to the participant banks in advance of the rate resets.[45]

As relevant, the indexes were discontinued in 2012 amidst the London Interbank Overnight Offered Rate (**LIBOR**) collusion scandal coming to light that year.[46]

In addition to indirect communications between the Defendants and other banks through the JJ Kenny and PARS Indexes, the record before the Court demonstrates that the Defendants engaged in direct communications with other banks with respect to where they intended to set rates.

---

[45] *See id*.; *see also* NYSCEF Doc. No. 2169 at 176.

[46] *See* NYSCEF Doc. No. 1698 at 63 (Mr. Wendt notes that "the LIBOR rate was manipulated by multiple banks, including defendants, Citi and JPMorgan, for profit, which resulted in billions of dollars in fines and criminal charges against individual traders").

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE                                      Page 29 of 44**
 **Motion No.  106 107 108 109 110 111 112 115 116 117**

[* 29]

One example of interbank communication comes from a 2008 conversation between Kimberly

Cleary from Piper Jaffray & Co. and Farah Desbas from BAML on Bloomberg's chat platform:

| Cleary: | How'd you do yesterday? I saw a couple of small puts, but they went right back out the door. Saw a couple this morning again, but it's already away. |
| Reply: | it was pretty quiet yesterday, thinking unchg on GM and a few bps cheaper on specialty names. |
| Reply: | I'm looking unch on my cleanest names and 10 for NY, 20 for CA right now… JJK came in at 1.15%. Any thoughts on weeklies yet? I'm in the 1.20% camp at the moment. |

(NYSCEF Doc. No. 2607).[47]

Another Bloomberg chat exchange from 2008 shows David Lo from Barclays asking Brian

Gonor from JPM for the PARS Index because "JOE LUPE LEFT [THEM] IN THE LURCH

AGAIN" and Mr. Gonor responded with "5.72" (NYSCEF Doc. No. 2129).

In 2012, another Bloomberg chat conversation features Citi's Thomas Broge and TD Bank's

Chris Dimon discussing the information they plan to provide to Mr. Luparello that morning:

| Dimon: | what no. you giving lup this morning? |
| Broge: | tusky says 21 |
| Dimon: | someone asking me where sifma goes this week |
| Broge: | down 1? |
| Dimon: | 21 would be down 2 |
| Dimon: | if we go with tusky # |
| | … |
| Dimon: | jj today? |
| Broge: | dunno where it ended up |
| Broge: | oh I got it…223 |
| Broge: | 22 |

(NYSCEF Doc. No. 1690).

---

[47] *See also* NYSCEF Doc. Nos. 2606, 2608 and 2609.

**100559/2014 EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**      **Page 30 of 44**
**Motion No. 106 107 108 109 110 111 112 115 116 117**

[* 30]

Another exchange shows Robert Toscanini from Citi asking Rick White from Wells Fargo what he thinks "SIFMA goes to next week?" and Mr. White replies: "[h]igher, but not above .35" (NYSCEF Doc. No. 2122).[48]

The record also includes evidence that interbank communications and market signaling continued at least into 2013 and after the PARS and JJ Kenny Indexes were discontinued. By way of example, in April of 2013, Barclays and JPM exchanged messages regarding where they "EXPECT WEEKLIES TO BACK UP TO" to which one of them responded: "OUR AAA RATE IS .17 (EXPECT SIFMA .16)" (NYSCEF Doc. No. 2217).

According to the Defendants, however, they allege that they monitored the markets constantly, analyzing a substantial amount of information such that they could meet their obligation to exercise proper judgment in their last-minute rate setting efforts which, by their admission, could have only taken a few seconds per individual rate set. According to James Brewer, BAML's rate-resetter:

> I worked long hours to analyze a wide variety of market information in order to exercise my judgment to determine the lowest rate that would permit a par remarketing of each VRDO. When I had management responsibilities, I observed the rate resetters working under my supervision dedicate the same amount of time and the same level of care that I had dedicated so that they could excel in their role. I believe that the Municipal Money Markets Desk was appropriately staffed, and, when asked, BofA disclosed its staffing levels to Issuers when responding to Requests for Proposal. My colleagues and I monitored the financial markets constantly to analyze the impact that market factors would have on VRDO rates

(NYSCEF Doc. No. 1639 at 5-6).

Similarly, Ms. Kercher stated in an affidavit that

---

[48] *See also* NYSCEF Doc. No. 1818 (Morgan Stanley).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

**Page 31 of 44**

31 of 44

"M&T complied with its contractual duties as a remarketing agent for VRDOs. Ms. Gorius and I personally set each VRDO rate individually every week. We did so based on our monitoring and understanding of the market, discussions with investors, review of the weekly SIFMA rate, and review of any other applicable information. M&T did not follow a "set-it-and-forget-it" approach to VRDO rate-setting, as Relator incorrectly contends in its opposition. Ms. Gorius and I considered multiple factors when examining rate-setting, including (among others): market rates and indices, such as SIFMA and the federal funds rate; interest rates for comparable securities (such as other comparable bonds of borrowers in M&T's portfolio); overall market and credit conditions; the credit rating and financial condition of the bank providing the letter of credit that supported the VRDO transaction; the rates on bonds backed by a letter of credit of another bank with the same credit rating as M&T; the amount of the VRDO supply held by investors; the amount of liquidity and/or capital of investors; and the par amount of the bond…

(NYSCEF Doc. No. 2714 at 2-3).[49]

However, and as discussed above, these affidavits appear to be irreconcilably at odds with the contemporaneous evidence which shows that the VRDOs were bucketed, rate resetting did not occur individually with little exception and that the rate resets occurred during a discrete amount of time such that each VRDO resets occurred within a few seconds each week.[50]

### VII. Scienter

The NYFCA defines a "knowing" submission of a false claim to mean that a defendant has (i) actual knowledge that the information upon which the claim is based is false, or else acts in (ii) deliberate ignorance or (iii) reckless disregard of the truth or falsity of the information (State Finance Law § 188 [3] [a]; *Total Asset Recovery Services*, 189 AD3d at 522). "A person acts with deliberate ignorance or reckless disregard where they ignore obvious warning signs and refuses to learn of information which it, in the exercise of prudent judgment, should have discovered" (*U.S. ex rel. Ervin and Assoc., Inc. v Hamilton Sec. Group, Inc.*, 370 F Supp 2d 18,

---

[49] *See also* NYSCEF Doc. Nos. 1868 (JPM), 1885 (Morgan Stanley) and 2006 (Citi).
[50] An issue undoubtedly to be explored at trial through cross-examination.

**100559/2014  EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                          **Page 32 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

[* 32]

42 [DDC 2005] [internal quotation marks and brackets omitted]).  Thus, "knowledge" includes both actual knowledge and failure to make a reasonable inquiry into the truth of certifications made before submitting claims for payment.  As is well settled, "the FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed" (*United States ex rel. Schutte v SuperValu Inc.,* 598 US 739, 749, 143 S Ct 1391, 1399, 216 L Ed 2d 1 [2023]).

As discussed above, the Appellate Division previously held that "[g]iven the nature of the alleged misrepresentations and the underlying facts, Defendants would have been aware of their own failures to individually assess each VRDO and aware that they were instead treating them in buckets, collectively" (*Edelweiss*, 189 AD3d at 724-725).

On the fully developed record, Relator adduces substantial evidence that the Defendants knowingly submitted false claims.  The evidence of collusion, including the manner in which the Defendants participated in the JJ Kenny and PARS Indexes and the plethora of interbank communications provide substantial insight into what the Defendants actually knew.  Indeed, as discussed above, although Morgan Stanley contests whether it was part of the PARS Index, the record evidence both shows that Morgan Stanley conspired with Mr. Luparello and that it knew that the conduct was wrong.  As an example, Andrew Rowley (Morgan Stanley) told Rick White (Wells Fargo) that Morgan Stanley had been giving Mr. Luparello information for the weekly index until compliance told them not to:

| | |
|---|---|
| White: | Did Joe Luparello used to call you for the weekly index? |
| White: | He did me on Tuesday and Wednesday.  Just trying to figure out when that stopped |
| Rowley: | I did. But we stopped because compliance didn't feel comfortable with it. |

[* 33]

White:          I think he stopped soon after

(NYSCEF Doc. No. 1817).

Additionally, and as discussed above, the record before the Court shows that on numerous occasions, when NY and the Companies complained to the Defendants that an interest rate reset was too high, the Defendants responded by changing the rates. This, under the circumstances, was an admission. The Defendants did not say that in accordance with the transaction documents, we provided the required service in exercising our professional judgment and this is what we determined was the minimum rate needed to clear at par. In fact, they did not say that or anything like that. They conceded that they had not exercised their judgment and just changed the rate (*see, e.g.,* NYSCEF Doc. No. 1828 communication between Morgan Stanley and a NY issuer [MTA]). By way of another example, in a 2008 email exchange between Richard Froelich from the New York City Housing Development Corporation and Kent Hiteshew from JPM, Mr. Hiteshew conceded that JPM's system for VRDO pricing includes a "small issue" penalty for deals under small issues:

> Froehlich:    Please check to see what is going wrong with the rates on 2008 g-1? The 2008 b and c-1 taxable bonds are being remarketed at much lower rate resets each week than g-1. Something is wrong with g-1 as it is being reset at 100 over LIBOR. If you are holding them then I think you should sell them rather than doing this to us. If you can't fix it we will add it to the fhlb deal. Thanks rich

> Hiteshew:    Rich-
> Sorry. JPM's system for VRDB pricing includes a "small issue" penalty for deals under $10mm. When Kyle and I got here we negotiated a waiver of that provision for all of my HFA clients – treating all series of similar tax/credit/mode character as one "large" issue for pricing purposes. Unfortunately, the system ("Hal") sometimes has glitches. We will manually adjust the 2008 G-1 to make sure this doesn't happen again…

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**        **Page 34 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

34 of 44

[* 34]

(NYSCEF Doc. No. 2095).[51]

## VIII.   *Damages*

Section 189 (1-3) of the NYFCA provides:

1. Subject to the provisions of subdivision two of this section, any person who:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision;

(d) has possession, custody, or control of property or money used, or to be used, by the state or a local government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(e) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state or a local government and, intending to defraud the state or a local government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(f) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a local government knowing that the officer or employee violates a provision of law when selling or pledging such property;

(g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

(h) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same; shall be liable to the state or a local government, as applicable, for a ***civil penalty*** of not less than six thousand dollars and not more than twelve thousand dollars, as adjusted to be equal to the civil penalty allowed under the federal False Claims Act, 31 U.S.C. sec. 3729, et seq., as amended, as adjusted for inflation by the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended (28 U.S.C. 2461 note; Pub. L. No. 101-410), plus three times

---

[51] *See also* NYSCEF Doc. Nos. 2115, 2209 (BAML), 2030 (M&T) and 1663 (Citi) (Mr. Toscanini explaining in an internal email, "I base my resets on inventory, news, & feedback I receive from customers").

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                                    **Page 35 of 44**
  **Motion No.  106 107 108 109 110 111 112 115 116 117**

35 of 44

[* 35]

the amount of all ***damages***, including consequential damages, which the state or local government sustains because of the act of that person.

2. The court may assess not more than two times the amount of damages sustained because of the act of the person described in subdivision one of this section, if the court finds that:

(a) the person committing the violation of this section had furnished all information known to such person about the violation, to those officials responsible for investigating false claims violations on behalf of the state and any local government that sustained damages, within thirty days after the date on which such person first obtained the information;

(b) such person fully cooperated with any government investigation of such violation; and

(c) at the time such person furnished information about the violation, no criminal prosecution, civil action, or administrative action had commenced with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation.

3. A person who violates this section shall also be liable for the costs, including attorneys' fees, of a civil action brought to recover any such penalty or damages.

(State Finance Law § 189 [1-3] [emphasis added]).

Relator adduces considerable evidence of actual damages caused by the alleged violation of the NYFCA. To wit, based on the alleged failure to provide the service of exercising professional judgment in obtaining the minimum rate that the VRDOS would clear at par, NY and the Companies paid substantially higher borrowing costs. According to Dr. S. Ilan Guedj, one of Relator's experts

I estimated three distinct categories of damages: (1) remarketing agent ("RMA") fees for remarketing services that Relator asserts Citibank did not provide; (2) fees paid by the State of New York to Citibank when it served as a liquidity facility provider that were rarely, if ever, called upon; and (3) alleged inflated VRDO interest rates on VRDOs reset by Citibank for which the State of New York overpaid interest to investors. I do not offer any opinion on whether Plaintiff is entitled to the three categories of damages I estimate in my reports

(NYSCEF Doc. No. 1700 ¶ 4). For example, as to category 3, for Morgan Stanley, Dr. Guedj estimated "a total of $34.6 million in gross inflated VRDO rate interest payment damages" (NYSCEF Doc. No. 1832 ¶ 14); for M&T, he estimated $8.3 million (NYSCEF Doc. No. 2060 ¶ 14); for JPM, he estimated $86.3 million (NYSCEF Doc. No. 2156 ¶ 14); and for BAML, he estimated $76.7 million (NYSCEF Doc. No. 2250 ¶ 14).[52]

For their part, the Defendants argue that Relator is not entitled to certain categories of damages, including disgorgement of fees, or the difference between allegedly inflated interest rates and rates that would have been set absent the alleged NYFCA violations because, as they argue, such amounts are speculative and otherwise would result in a windfall.[53] As discussed above, the Defendants are correct that disgorgement and other recessionary remedies are simply not available under the NYFCA. However, the Defendants' arguments with respect to actual damages fall flat. The fact that the Defendants acknowledged and corrected certain rates sinks this argument.[54]

The Defendants have each moved for summary judgment dismissal arguing that Relator fails to adduce evidence in support of each element of the NYFCA which must be satisfied. Except as it relates to the private conduit bonds and disgorgement of fees as a remedy, as discussed below

---

[52] It is however unclear which portion of this amount relates solely to non-conduit bonds. Dr. Guedj also indicates other damages including damages related to fees charged, but as discussed above, these other categories of damages are not recoverable under the NYFCA.

[53] BAML argues that "to the extent Relator seeks consequential damages based on the difference between allegedly inflated interest rates and rates that would have been set absent the alleged NYFCA violations, such damages are speculative—there are no objectively correct rates" (NYSCEF Doc. Nos. 1701 at 21-22 [BAML]). The other Defendants also argue that recovery of both remarketing fees and inflated interest payments would be duplicative and result in an impermissible windfall for issuers (NYSCEF Doc. No. 1919 at 22-24 [M&T]; NYSCEF Doc. No. 2276 at 21-22 [JPM]; NYSCEF Doc. No. 2253 at 22-24 [Morgan Stanley]; NYSCEF Doc. No. 2160 at 23-25 [Citi]).

[54] For completeness, the Court notes that to the extent the Defendants' expert disputes the Dr. Guedj's methodology (NYSCEF Doc. No. 2717 at 119-200), this simply presents an issue for trial.

[* 37]

they are not entitled to judgment as a matter of law. Relator has moved for partial summary judgment as to certain elements of the NYFCA (materiality, falsity and scienter). Although it has adduced substantial evidence in support of each of these elements of the NYFCA, it too is not entitled to judgment as a matter of law as to falsity and scienter.[55]

## DISCUSSION

On a motion for summary judgment, the movant "must make a *prima facie* showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez*, 68 NY2d at 324). The opposing party must then "produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact" that its claim rests upon (*Zuckerman v New York*, 49 NY2d 557, 562 [1980]).

The NYFCA developed as an analogue to the federal False Claims Act and subjects "any person who…knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" by the State, or "knowingly makes, uses, or causes to be made or used, a false record or statement material to" such a false or fraudulent claim, to civil liability including treble damages (State Finance Law §§ 189 [1] [a], [b], [g]). The NYFCA allows relators "to blow the whistle on a government contractor's fraudulent claims by bringing a *qui tam* action on behalf of the State of New York," and "it is the intent of the statute to be applied broadly to almost any situation where state dollars are involved" (*State ex rel. Grupp v DHL Exp. (USA), Inc.*, 19

---

[55] As discussed above, the fully developed record includes substantial evidence that (i) with respect to the private conduit bonds, the Companies paid remarketing fees, LOC fees and interest to the Defendants potentially at a rate which was not the product of the required judgment, these are not damages incurred by NY and are thus not recoverable in this lawsuit under the NYFCA and (ii) NY paid remarketing fees and LOC fees, the NYFCA does not provide for restitution such that the recovery of these fees is appropriate.

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**                    **Page 38 of 44**
  **Motion No.  106 107 108 109 110 111 112 115 116 117**

[* 38]

NY3d 278, 288 [2012] [Pigott, J. (dissenting)]). "The NYFCA follows the federal False Claims Act (31 USC § 3729 *et seq.*) and therefore it is appropriate to look toward federal law when interpreting the New York act" (*State ex rel. Seiden v Utica First Ins. Co.*, 96 AD3d 67, 71 [1st Dept 2012]; *New York ex rel Khurana v Spherion Corp.*, 15 CIV. 6605 [JFK], 2016 WL 6652735, at *9 [SDNY Nov. 10, 2016]).

As discussed above, the NYFCA imposes liability on any person or entity who:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
(c) conspires to commit a violation of paragraph (a) [or] (b)…of this subdivision

(State Finance Law §§ 189 [1] [a] – [c]).

A claim under the NYFCA "requires proof that the defendant: (1) made a claim, (2) to the government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment or approval. The knowledge requirement is satisfied by actual knowledge, deliberate ignorance, or reckless disregard of the falsity of information provided. Violators are subject to treble damages and a civil penalty" (*Khurana* at *9 [internal citations omitted]). As discussed above, there simply are no issues of fact that the first, second, and fifth elements are satisfied of the NYFCA are established as a matter of law.

The Defendants presented three separate claims as part of an integrated transaction for payment in respect of the non-conduit bonds to NY seeking payment or approval. There are also no issues of fact as to whether the failure to exercise the required judgment was material. As discussed

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**          **Page 39 of 44**
Motion No.  106 107 108 109 110 111 112 115 116 117

39 of 44

[* 39]

above, the alleged failure to exercise the required judgment deprived NY of the intended benefits of the VRDO transactions (*Escobar*, 579 US at 181). Under the circumstances, and given the deposition testimony indicating that the quintessential part of the VRDO rate resetting arrangement was the requirement that the Defendants exercise their judgment in setting the rates at the minimum rate that the VRDOs would clear at par (lowest borrowing costs) and certain other evidence of materiality adduced by Relator (State Finance Law § 188 [5]; *Escobar*, 579 US at 181, 193-194; *Care Alternatives*, 81 F4th at 367; *Fed. Deposit Ins. Corp.* at *4), the Defendants are not correct that there remains any issues of fact as to whether the alleged failure to exercise the required judgment was material much less that dismissal is appropriate because it was not material.

The critical issues for trial are simply (1) whether the claims were false – *i.e.*, did the Defendants exercise the required judgment in the rate resets, (2) whether the Defendants subjectively had (i) actual knowledge that the information upon which the claims were based were false, or else acted in (ii) deliberate ignorance or (iii) reckless disregard of the truth or falsity of the information presented and (3) what portion of the actual damages estimated by Relator includes only non-conduit bonds and whether the estimated damages as to this amount are in fact appropriate.

The Defendants' argument that the remarketing invoices were not facially or legally false requiring dismissal falls flat. Although the language in the invoices was not uniform, the remarketing invoices represented that they were for the remarketing service of exercising the required judgment to obtain the minimum rate (lowest borrowing costs) that the bonds would

**100559/2014 EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**
**Motion No. 106 107 108 109 110 111 112 115 116 117**

**Page 40 of 44**

40 of 44

[* 40]

clear at par. The rate reset notifications which set forth the rates and triggered payment of the interest due represented that the interest rate had been reset at the levels set forth in the rate reset notifications and also impliedly represented that these reset rates were the product of the required judgment. Lastly, the LOC invoices too represented that the credit facility had been provided in the Maximum Amount of the Credit Facility regardless of usage per the language of the LOC invoices and also impliedly represented that the Defendants had exercised the requisite judgment in obtaining the lowest rate that the VRDOs would clear at par, triggering the use of the LOC to make the VRDO bondholder payment and requiring reimbursement from the issuer or the Company.

The Defendants are also not entitled to summary judgment dismissal based on their recently executed affidavits and conclusory statements that they did in fact exercise the required judgment (*i.e.,* that the claims were true), their recent assertions that they did not subjectively know the claims were false or that they did not act with deliberate ignorance or reckless disregard of the truth or falsity of claims or based on otherwise objectionable non-admissible testimony from fact lay witnesses based on questions calling for legal conclusions or, finally, based on their assertion that there was no conspiracy.[56]

Conspiracy under the NYFCA requires a showing "(1) that Defendants conspired with each other to get a false or fraudulent claim allowed or paid by the government; and (2) that one or more of

---

[56] Relator confirmed (*tr.* 3.3.25) that it withdrew its conspiracy claim against M&T, as such, the portion of M&T's motion seeking summary judgment dismissing the conspiracy claim against it was granted by Order dated March 4, 2025 (NYSCEF Doc. No. 2897).

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**               **Page 41 of 44**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

41 of 44

them performed any act to effect the object of the conspiracy" (*Edelweiss*, 189 AD3d at 725; State Finance Law §§ 189 [1] [c]).[57]

The mountain of evidence raised in opposition to the Defendants' motions, including, the internal communications, internal memos, the time in which the rate sets actually occurred per VRDO, that they marketed only or primarily to money market funds (*i.e.*, limited the pool of purchasers), the other evidence of collusion, the parties' seemingly full understanding of their agreement as to how rates were to be set through the supply and receipt of information through intermediaries with the express understanding that each of them were making claims to NY for payment (*i.e.,* agreement as to the conduct which would violate the NYFCA), the inappropriate bucketing of dissimilar VRDOs (including with respect to certain Defendants, pre-set formulas in their own spreadsheets applied to dissimilar bonds), the contemporaneous admissions of rate corrections when they received complaints (without any indication that the rates had been the product of their judgment even if higher than others), their internal communications indicating compliance was no longer comfortable with what they were doing, and their other admissions (*e.g.*, that they changed rates to clear their own inventory) (State Finance Law § 188 [3] [a]; *Total Asset Recovery*, 189 AD3d at 522; *Ervin*, 370 F Supp 2d at 42; *SuperValu,* 598 US at 749), among other things, necessarily requires denial of their motions.

As to Relator's motions, although a much closer call, Relator is only entitled to the grant of summary judgment on the issue of materiality. It is not entitled to the grant of summary

---

[57] The Court notes that to the extent that the Defendants argue that a conspiracy requires an agreement "to violate the NYFCA" this is not correct. The agreement required is an agreement as to **conduct** which violates the NYFCA not an agreement to violate the NYFCA.

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

**Page 42 of 44**

42 of 44

judgment on the issues of falsity or scienter. As to falsity and scienter, at bottom, there are issues of credibility for the fact finder. Although Relator meets its *prima facie* burden in demonstrating its entitlement to judgment as a matter of law for all of the reasons set forth above (*Alvarez*, 68 NY2d at 324), the Defendants' affidavits must be tested through cross-examination. It is theoretically possible (notwithstanding the lack of contemporaneous evidence supporting any such assertions and the appearance that the Defendants waited until the last moment when they received material non-public information such that they knew what each other was doing) that the Defendants could have made appropriate provision for the setting of rates during the week such that in the limited time that they gave themselves to do so at the end of the week, they exercised the appropriate judgment required pursuant to the VRDO transaction documents.

"Actual damages are the difference in value between what the government bargained for and what the government received" (*U.S. ex rel. Wall v Circle C Const., LLC*, 813 F3d 616, 617 [6th Cir 2016]). As discussed above, disgorgement of fees is simply not provided for as a remedy under the NYFCA. In this case, actual damages are equal to the delta between what the rate should have been had the Defendants exercised the required judgment and the inflated interest rate NY paid on the non-conduit bonds. As discussed above, the Defendants are not correct that inflated interest rate damages are too speculative or provide for a windfall. Among other things, and as discussed above, the fact that the Defendants corrected rates upon complaint from the Companies and NY wholly undermines this argument. Lastly, the Court notes that there are no issues of fact as to the other damages provided for in the statute (*e.g.,* civil penalties, attorneys fees or that damages includes three times the amount of actual damages).

The Court has considered the parties' remaining arguments and finds them unavailing.

Accordingly, it is hereby

ORDERED that the Defendants' motions (Mtn. Seq. Nos. 106, 107, 108, 109 and 110) for summary judgment are DENIED *except* to the extent that (i) Relator's NYFCA claims involving private conduit bonds are dismissed without prejudice and (ii) the branch of the motions seeking dismissal of the claims for disgorgement of fees are granted; and it is further

ORDERED that Relator's motions (Mtn. Seq. Nos. 111, 112, 115, 116 and 117) for summary judgment are GRANTED as set forth above and to the extent that there are no issues of fact as to materiality.

20250404145551AD0RR0KFEB2F04DF8354DE28F0BA529C418D597

**4/4/2025**
**DATE**

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

**100559/2014   EDELWEISS FUND, LLC, vs. JP MORGAN CHASE**
**Motion No.  106 107 108 109 110 111 112 115 116 117**

**Page 44 of 44**

[* 44]